Kavon Adli (Bar No. 203040)
kavon@tilg.us
Richard A. De Liberty (Bar No. 203754)
richard@tilg.us
THE INTERNET LAW GROUP
9107 Wilshire Boulevard, Suite 450
Beverly Hills, CA 90210
tel. (310) 910-1496
fax (310) 356-3257

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW HOGAN,<br><br>                Plaintiff,<br><br>v.<br><br>MATTHEW J. WEYMOUTH,<br>PATRICK C. CHUNG,<br>PRO SPORTORITY (ISRAEL) LTD.,<br>KARL RASMUSSEN,<br>BEASLEY BROADCAST GROUP INC.,<br>MELISSA EANNUZZO, and<br>DOES 1–10,<br><br>                Defendants. | No. 2:19-cv-2306<br><br>**COMPLAINT FOR:**<br>**(1) DEFAMATION;**<br>**(2) DISCLOSURE OF PRIVATE FACTS;**<br>**(3) FALSE LIGHT PUBLICITY;**<br>**(4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AND**<br>**(5) CIVIL HARASSMENT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Matthew Hogan alleges:

**JURISDICTION**

1.    This Court has jurisdiction of this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the defendants are citizens of either different States than the plaintiff or a foreign state.

**PARTIES**

2.    Matthew Hogan is a citizen of California. Hogan resides in Los Angeles and, until recently, worked for the Los Angeles Rams as one of eight ticket sales account executives.

3. Defendant Matthew J. Weymouth is a citizen of Massachusetts. Hogan and Weymouth have been acquainted since college.

4. Defendant Patrick C. Chung is a citizen of Massachusetts. Chung is a safety for the New England Patriots. Chung owns and operates verified accounts on Instagram and Facebook. On information and belief, Weymouth manages these accounts for Chung and sometimes posts to them on Chung's behalf.

5. Defendant Pro Sportority (Israel) Ltd. ("Sportority" or "12up") is an Israel corporation with its principal place of business in Israel. Sportority owns and operates the website www.12up.com and the Twitter account @12upSport.

6. Defendant Karl Rasmussen is a citizen of Oregon. Rasmussen writes for 12up.

7. Defendant Beasley Broadcast Group Inc. ("Beasley" or "Hot 96.9") is a Delaware corporation with its principal place of business in Florida. Beasley owns and operates the radio station Hot 96.9 Boston, the website hot969boston.com (including "Melissa's Blog"), and the Twitter accounts @HOT969Boston and @GetUpCrew969.

8. Defendant Melissa Eannuzzo is a citizen of Massachusetts. Eannuzzo is a radio personality on Hot 96.9's "Get Up Crew" morning show and, on information and belief, writes and operates "Melissa's Blog" on Hot 96.9's behalf.

9. The true names of Does 1–10 are unknown to plaintiff.

10. Does 1–5 were another defendant's agents.

11. Does 6–10 have unknown capacities.

**FACTS**

12. Hogan met Weymouth through mutual friends during college.

13. Since then, the two have spoken little but remained connected on social media.

14. On Instagram, Weymouth portrayed himself as a Patriots fan.

15. Weymouth sometimes posted photos of himself with Chung, but the nature of their relationship was unknown to Hogan.

16. Super Bowl LIII was set to be played in Atlanta, Georgia, on Sunday, February 3, 2019.

17. Hogan planned to travel from Los Angeles to attend the game as a spectator.

– 2 –

18. On January 22, 2019, Weymouth posted a photo on Instagram with the caption "Atlanta here we come!"

19. Hogan responded, "Can you help me get tickets?" This was a joking reference to an earlier Facebook post in which Weymouth stated, "Please stop asking me and my family for Patriots Tickets, Celtics Tickets, Red Sox Tickets, Autographs, Video Messages and jock straps thank you!"

20. Weymouth learned from a mutual friend that Hogan also planned to attend.

21. On January 30, Weymouth left a voicemail for Hogan:

Hey fuckhead I got a ticket for you in my fucking zipper. I hope you're gonna be in Atlanta dude. Fucking uh. I get there tomorrow morning like 6 a.m. I leave here, I leave Boston at like 6 a.m. so I should be there around noon or so um I am on the Patriot's charter thing umm we're going to kick your fucking ass but in all honesty I hope to see you down there bro. Hit me up when you get in I think I was talking to [a mutual friend] I think you get in tonight but uh I'll be there in the morning till uh Monday. So hopefully we can get together grab a drink or something hope all is well pal talk to you soon.

22. In the days before the game, Hogan and Weymouth did meet once, and the playful trash talk continued.

23. When game day came, Hogan was one of over 70 thousand fans who filled the Atlanta stadium to watch.

24. When the third quarter began, the score was Patriots 3, Rams 0. The Patriots kicked off and the Rams were on offense. On the second play, the Rams advanced sixteen yards for a first down.

25. When the third play ended, Chung appeared to be injured and trainers came on the field.

26. In the moment, Hogan was skeptical that Chung was truly injured, let alone that his injury was serious.

27. As a joke, Hogan texted Weymouth, "Patrick Chung is a bitch." The entire exchange between Weymouth and Hogan is Exhibit A.

28. Hogan intended the text to be private and expected Weymouth to read it against their frequent playful exchanges of trash talk in the preceding days and weeks.

29. A short while later, Chung left the field wearing an air cast.

30. In the meantime, Weymouth responded angrily with over thirty threatening text messages, such as: "Your [*sic*] a cunt for saying that"; "Hey seriously don't let me see you"; "Ok bro I'm coming for you"; "Yo where you at . . . Pussy"; "What row on my way"; "You fucked up"; "If I see you I'm going to jail and I don't care." To prove he was searching for Hogan, Weymouth sent photos, adding: "Right here pussy"; "Here are you [*sic*] seats hahah"; "Fucking pussy"; "At your 'seat' you broke bitch"; "You ain't here and you don't want nothing pussy." Ex. A.

31. After the game, it was reported that Chung's arm was broken.

32. On information and belief, Weymouth took screenshots of selected parts of his text exchange with Hogan, and shared the screenshots with Chung.

33. On information and belief, Weymouth made false and misleading representations to Chung about Hogan and about the text exchange between Hogan and Weymouth.

34. On Wednesday, February 6, a post was published on Chung's Instagram account featuring screenshots of selected parts of the text exchange between Hogan and Weymouth such that it appeared to be an exchange between Hogan and Chung himself:



35. The post also featured a comment, purportedly from Chung himself:

> Matt Hogan from the @rams organization. This is disrespectful of you. I would never wish or say anything like this to anyone after they just broke their arm. You should be ashamed bro. Can't even believe it. But I pray for happiness and good health for you because a real man [*sic*].

36. Around the same time, a post was published on Chung's Facebook page featuring the same screenshots and comment, again making the text exchange appear to be between Hogan and Chung himself.

37. On information and belief, Weymouth composed and posted the Instagram and Facebook posts on Chung's behalf.

38. The posts on Chung's Instagram and Facebook accounts were false in a number of ways. Hogan was not positioned to speak for the Rams; he was one of eight ticket sales account executives. Hogan did not send the text to Chung as a taunt; he sent it to Weymouth as a joke to be understood in the context of their ongoing trash talk and expected it to be private. When he sent Weymouth the text, Hogan did not know that Chung's injury was serious, that his arm was broken, or that he would not return to the game. The responding texts are not from Chung; they are from Weymouth. On information and belief, Chung did not write the comment or post the screenshots himself; they were written and posted by Weymouth on Chung's behalf.

39. On information and belief, Chung and Weymouth knew that the Instagram and Facebook posts were false in these ways.

40. Based on the false statements in the Instagram and Facebook posts, commenters posted remarks about Hogan that were disparaging, threatening, and harassing.

41. On Instagram, one commenter asked, "Who the fuck is Matt Hogan." User @k_weymouth responded by posting Hogan's Instagram username. As a result, Hogan began receiving direct messages on Instagram that were disparaging, threatening, and harassing.

42. As a result of the harassment, Hogan disabled his Instagram and Facebook accounts.

43. A few hours after they were published, the posts were deleted from Chung's Instagram and Facebook accounts.

1  44.   Later that same day, 12up published a tweet on its Twitter account featuring screenshots
2  of the deleted Instagram post and stating that that Hogan is a "Rams exec" and that the text message
3  shows him "going after [Chung] for breaking his arm." The 12up tweet is Exhibit B.
4  45.   On information and belief, Rasmussen composed and posted the 12up tweet on 12up's
5  behalf.
6  46.   Also that day, 12up and Rasmussen published an article that embeds the 12up tweet and
7  states that: (a) "one of the team's executives had some harsh words for Chung after the game"; (b) the
8  "leaked" text shows that Hogan "took some shots at Chung, calling the safety a 'b***h' after the 32-year
9  old went down with his injury"; (c) "Chung is believed to be on the receiving end of these text
10 messages"; and (d) the responding texts show that "Hogan is far from forgiven in Chung's mind." The
11 12up article is Exhibit C.
12 47.   In the article, 12up and Rasmussen expressed doubts about the story, qualifying at the
13 start, "[i]f these messages are real," conceding that it was "not confirmed" that Chung received the
14 messages, and speculating that Hogan might have "texted the wrong person."
15 48.   Also that day, Beasley and Eannuzzo published an article on "Melissa's Blog" on the Hot
16 96.9 website entitled, "Patrick Chung Goes After Rams Executive Who Mocked His Injury." The article
17 quotes the comment from Chung's Instagram post and states that the exchange was "between [Chung]
18 and Matt Hogan" and "started with Hogan calling [Chung] a 'b**ch." The "Melissa's Blog" article is
19 Exhibit D.
20 49.   On February 8, Hot 96.9 repeated the false story in a podcast and in a post on its website
21 and a tweet, both linking to the podcast. In the podcast, host "Melissa" (Eannuzzo) states that "someone
22 from the Ram's front office" texted Chung directly and quotes the responding texts and Instagram
23 comment as being from Chung. The linking post and tweet describe the episode as one in which "Patrick
24 Chung goes off on the Rams." The post is Exhibit E. The tweet is Exhibit F.
25 50.   Hot 96.9 and Eannuzzo concede in the podcast that they were aware that Chung's
26 Instagram post had been quickly deleted, stating that it "was legit up for like two seconds" and "within a
27 few minutes he took it down."
28

51. The stories by 12up, Rasmussen, Hot 96.9, and Eannuzzo are false in a number of ways. Hogan was not a Rams executive, which suggests a top officer who speaks for the organization; he was one of eight ticket sales account executives. Hogan did not send the text to Chung as a taunt; he sent it to Weymouth as a joke to be understood in the context of their ongoing trash talk and expected it to be private. When he sent Weymouth the text, Hogan did not know that Chung's injury was serious, that his arm was broken, or that he would not return to the game. The responding texts are not from Chung; they are from Weymouth. On information and belief, the screenshots and comment were not posted by Chung himself; they were posted on Chung's behalf by Weymouth.

52. 12up, Rasmussen, Hot 96.9, and Eannuzzo had reason to doubt their stories. Hogan is not listed as an executive on the Ram's website. The text refers to Patrick Chung by name, which would be odd if he were the recipient. The time stamp above the text shows that it was sent at 8:36 p.m., when Chung was still on the field with trainers. And the posts on Chung's Facebook and Instagram accounts had been quickly deleted, which should have been a red flag.

53. Before publishing and broadcasting their stories, 12up, Rasmussen, Hot 96.9, and Eannuzzo did not contact Hogan for comment and, on information and belief, did no other fact checking.

54. The publications and broadcasts by all defendants are harmful to Hogan's reputation. They suggest that he was a leadership figure who irresponsibly and heartlessly taunted a player knowing that he had just suffered a serious injury and the resulting disappointment of missing out on part of an important game. In fact, Hogan exchanged private trash talk with another spectator in the moment and before knowing the seriousness of the player's injury.

55. The publications and broadcasts expose private information concerning Hogan that is not of legitimate public concern and the publicity is highly offensive.

56. The publications and broadcasts present Hogan's private text messages in context that paints Hogan in a false and highly offensive light.

57. As a result of the defendants' false, misleading, and intrusive publications and broadcasts, Hogan was forced from his job, has been turned down for other job opportunities, and

remains unemployed. Hogan has lost earnings, including salary, overtime, commissions, and benefits, and has lost future earning capacity and economic opportunities.

58. As a result of the publications and broadcasts, Hogan has incurred expenses searching for a new job, securing substitute benefits, and addressing negative publicity, and will be forced to incur further expenses.

59. As a result of the publications and broadcasts, Hogan has received harassing messages and been subjected to scorn, hatred, ridicule, and contempt on social media and elsewhere. Hogan has suffered emotional distress, impairment to his reputation and standing in the community, personal humiliation, shame, and disgrace.

60. On February 19, Hogan notified Hot 96.9 of the defamatory publications and broadcasts and demanded corrections.

61. Hot 96.9 failed to publish or broadcast corrections.

## FIRST CLAIM

### Defamation (Against Each Defendant Except Weymouth)

62. All allegations of this complaint are incorporated into this first claim.

63. The defendant made false statements to persons other than the plaintiff.

64. These people reasonably understood that the statements were about the plaintiff.

65. Because of facts and circumstances known to readers and listeners of the statements, they tended to: (a) injure the plaintiff in his occupation; (b) expose him to hatred, contempt, ridicule, and shame; and (c) discourage others from associating or dealing with him.

66. The defendant failed to use reasonable care to determine the truth or falsity of the statements.

67. The plaintiff suffered harm, including harm to his occupation and reputation, expenses, and shame, mortification, and hurt feelings.

68. The defendant's conduct was a substantial factor in causing the plaintiff's harm.

69. The defendant acted with malice, oppression, and fraud.

## SECOND CLAIM

### Disclosure of Private Facts (Against Each Defendant)

70. All allegations of this complaint are incorporated into this second claim.

71. The defendant publicized private information concerning the plaintiff.

72. A reasonable person in the plaintiff's position would consider the publicity highly offensive.

73. The defendant knew that a reasonable person in the plaintiff's position would consider the publicity highly offensive, or acted with reckless disregard of that fact.

74. The private information was not of legitimate public concern.

75. The plaintiff suffered harm.

76. The defendant's conduct was a substantial factor in causing the plaintiff's harm.

77. The defendant acted with malice, oppression, and fraud.

## THIRD CLAIM

### False Light Publicity (Against Each Defendant Except Weymouth)

78. All allegations of this complaint are incorporated into this third claim.

79. The defendant publicly disclosed information or material that portrays the plaintiff in a false light.

80. The false light created by the disclosure would be highly offensive to a reasonable person in the plaintiff's position.

81. The defendant was negligent in determining the truth of the information or whether a false impression would be created by its disclosure.

82. The plaintiff suffered harm, including harm to his occupation and reputation, expenses, and shame, mortification, and hurt feelings.

83. The defendant's conduct was a substantial factor in causing the plaintiff's harm.

84. The defendant acted with malice, oppression, and fraud.

## FOURTH CLAIM

### Intentional Infliction of Emotional Distress (Against Each Defendant)

85. All allegations of this complaint are incorporated into this fourth claim.

86. The defendant's conduct was outrageous.

87. The defendant intended to cause the plaintiff emotional distress.

88. The plaintiff suffered severe emotional distress.

89. The defendant's conduct was a substantial factor in causing the plaintiff's severe emotional distress.

90. The defendant acted with malice, oppression, and fraud.

## FIFTH CLAIM

### Civil Harassment (Against Weymouth)

91. All allegations of this complaint are incorporated into this fifth claim.

92. The defendant made credible threats of violence against the plaintiff.

93. The defendant engaged in a knowing and willful course of conduct directed at the plaintiff that: (a) seriously alarms, annoys, and harasses the plaintiff; (b) serves no legitimate purpose; and (c) has caused substantial emotional distress to the plaintiff.

## PRAYER

The plaintiff prays for judgment for:

1. An order enjoining defendant Weymouth from harassing or contacting the plaintiff;
2. Economic damages of not less than $1.75 million;
3. Damages for emotional distress, reputational harm, and other noneconomic damages;
4. Punitive damages;
5. Costs of suit; and
6. Such other relief as is fair, just, and equitable.

DATED: March 27, 2019

THE INTERNET LAW GROUP

/s/ Richard A. De Liberty
Richard A. De Liberty
Attorneys for Plaintiff

**JURY TRIAL DEMAND**

The plaintiff demands a jury trial on all the issues so triable.

DATED: March 27, 2019

                              THE INTERNET LAW GROUP

                              /s/ Richard A. De Liberty
                              Richard A. De Liberty
                              Attorneys for Plaintiff